Peter WRIGHT and Beneficial Standard Corporation, Plaintiffs,

v.

The HEIZER CORPORATION and International Digisonics Corporation, Defendants.

No. 72 C 2536.

United States District Court,
N. D. Illinois, E. D.

Dec. 3, 1975.

Edward Slovick, James S. Gordon, Chicago, Ill., for plaintiffs.

David P. List, Henry L. Mason, Chicago, Ill., for International Digisonics.

Max Wildman, Wildman, Harrold, Allen & Dixon, Chicago, Ill., for Heizer.

MEMORANDUM DECISION

MARSHALL, District Judge.

This action presents questions concerning the class of persons who may maintain a private action for equitable relief under Rule 10b–5 of the Securities and Exchange Commission; the scope of the substantive provisions of that Rule; and the appropriate equitable relief to be granted in light of the violations of the Rule which have been proved.

■ The case was tried without a jury[1] prior to the Supreme Court's decision in *Blue Chip v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975). There the Court gave limited approval to the *Birnbaum*[2] purchaser-seller limitation on the class of persons entitled to seek money damages under Rule 10b–5. It is that limitation which gives rise to the threshold question of whether plaintiffs may maintain this action for equitable relief in view of the fact that they did not participate directly as either the purchasers or sellers of the securities involved in this action.

Our starting point will be the basic facts which are essentially undisputed. Jurisdiction is present under 15 U.S.C. §§ 78j and 78aa. This memorandum will stand as our findings and conclusions under Rule 52(a), *Fed.R.Civ.P.*

### The Basic Facts

Plaintiffs, Peter Wright and Beneficial Standard Corporation are and at all material times have been minority common shareholders in defendant International Digisonics Corporation (IDC), a Delaware corporation. IDC and its wholly owned subsidiary Talent and Residuals, Inc. (TR), also a Delaware corporation, are engaged in two separate but related service businesses: IDC monitors television commercials as they are shown on the air to assure that the commercials are shown as agreed to by the television industry; TR performs the accounting and record keeping services necessary to the accurate and adequate compensation of the persons performing in the commercials. IDC and TR were organized in 1968 by Jordan Ross who is IDC's principal common shareholder and who, during most of the transactions complained of,

was IDC's president and chief executive officer.

IDC's monitoring service has not prospered financially. The fact of this financial distress is of significance; the reasons for that distress are not and they were not fully developed at the trial. Suffice it to say that IDC has encountered technical electronic problems occasioned in part by the fact that some commercials are shown on film, others on video tape, some nationally, others locally.

In contrast, TR's talent accounting service has prospered financially. So much so that, as we shall see, it became the plum which defendant Heizer Corporation (Heizer) plucked as a hedge against Heizer's large investments in IDC's monitoring operation.

Heizer is a closely held investment company specializing in privately placed venture capital investments in new and developing industries and businesses. Many of its own investors are regulated institutions that could not invest directly in a new and developing business or industry because of the risk. Heizer and its investors hope to reap substantial profits from their venture investments. But their hopes are not always realized as the facts in this case show.

In November 1969, IDC was in need of cash for its monitoring business. It sought its needs from Heizer who invested $1,500,000 on the following terms.

Pursuant to a written agreement, IDC amended its certification of incorporation to create a new class of stock known as Class A common stock. Heizer purchased 100,000 shares of Class A common at $10 per share. IDC issued to Heizer a warrant to purchase 155,000 shares of IDC common at a basic purchase price of $8.50 per share, which con-

---

1. When plaintiffs withdrew their jury demand, defendant Heizer demanded trial by jury. Heizer's demand was denied because all of the relief sought is equitable and all of the issues of fact raised by the pleadings are of a nature which can be tried by a chancellor without a jury consistent with the Seventh Amendment.

*Cf. Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970).

2. *Birnbaum v. Newport Steel Corp.*, 193 F.2d 461 (2d Cir. 1952) *cert. denied*, 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952).

tained an adjustment of purchase price ("antidilution clause") reducing the price to Heizer in the event IDC issued or sold any of its common shares at less than $8.50. Heizer agreed to lend IDC, at the latter's option, up to $500,000 with interest at 2% over prime. The agreement between Heizer and IDC contained rather typical disclosure, continuation of business, and non-merger, sale or encumbrance of assets clauses.

The documents embodying the agreement were presented to the IDC board of directors at a duly called meeting held November 5, 1969. The directors unanimously approved all the terms and conditions of the agreement and resolved to present to the IDC stockholders the amendment to IDC's certificate of incorporation creating the Class A common stock.

The stockholders meeting was held immediately following the directors meeting pursuant to notice given the stockholders, which included a statement of the important terms of the proposed Class A common stock. In addition, prior to the meeting, the holders of approximately 80% of IDC's outstanding common stock, including plaintiff Beneficial Standard Corporation, had received from IDC copies of all of the documents relating to the total transaction with Heizer. A quorum of stockholders attended the meeting and the proposed amendment to the certificate of incorporation was unanimously approved by those in attendance. On November 6, 1969, the first transaction was closed. On May 25, 1970, pursuant to the first transaction, Heizer loaned IDC $500,000 until May 25, 1971 with interest at 2% over prime.

In the summer of 1970 IDC was again in need of cash for its monitoring business and it approached Heizer to make an additional investment for the monitoring business. On September 1, 1970, IDC and Heizer entered into and executed an agreement which culminated in Heizer's investment of $2,000,000. The agreement provided that IDC would again amend its certificate of incorporation, this time to authorize 350,000 shares of a new class of preferred stock with certain rights and preferences, the most significant of which was a weighted vote of 4.4 per share on all shareholder votes. Heizer was to exchange the 100,000 shares of its previously purchased Class A common for 100,000 shares of the new preferred. IDC was to sell Heizer an additional 200,000 shares of the new preferred at $10 per share in two takedowns of $1,000,000 each. Upon completion of the second takedown, IDC was to issue to Heizer an additional warrant to purchase 400,000 shares of IDC common at a basic purchase price of $6 per share, with an antidilution clause comparable to the first warrant. The protective provisions regarding continuation of business, etc., were, of course, repeated.

The documents evidencing the second transaction were presented to the IDC board of directors at a meeting duly called pursuant to notice on August 31, 1970. At that meeting a majority of the IDC directors were present and those present unanimously approved the terms and conditions of the second transaction and resolved to present to the stockholders the proposed amendment to IDC's certificate of incorporation creating the new preferred stock.

On August 5, 1970 IDC had mailed a notice of a special meeting to stockholders calling the meeting for September 1, 1970. The notice was not accompanied by any enclosures, attachments or documents relating to the second transaction but it did state the shareholders would "review, consider and vote upon the financing propositions." Furthermore, prior to the September 1, 1970 stockholders meeting, the holders of approximately 54% of IDC's outstanding common stock received copies of all of the documents relating to the second transaction. Pursuant to the notice, the special meeting of stockholders was held. A quorum of a majority of the shareholders was present. By a unanimous vote of those present and voting, the new preferred stock was approved as was the second transaction.

In February, 1971, the second transaction was fully consummated to the end that Heizer was then the owner of 300,000 shares of the new preferred stock, one warrant to purchase 150,000 shares of common at $8.50 per share, a second warrant to purchase 400,000 shares of common at $6 per share and IDC's note for $500,000 due May 25, 1971.

In the spring of 1971, IDC again approached Heizer to make yet another investment to provide IDC with funds to purchase more monitoring equipment. On May 13, 1971, IDC and Heizer executed an agreement which became the third transaction. It provided for an amendment to IDC's certificate of incorporation to increase the authorized common stock to 3,000,000 shares, the sale by IDC to Heizer of a 20-year senior note in the principal amount of $1,700,000, the issuance by IDC to Heizer of an additional warrant to purchase 472,222 shares of IDC common at $3.60 per share and an adjustment in the purchase price under the warrants issued in the first two transactions so that they could be exercised for common stock at a price of $3.60 per share. The effect of the price adjustment was not, however, limited to a reduction in the purchase price per share under the first two warrants. It also increased the number of shares of common purchasable at the reduced price. Thus, under the first warrant Heizer could now purchase 276,223 shares of common at $3.60; under the second 555,555 at $3.60; under the third 472,222 at $3.60; all to the end that at the conclusion of the third transaction it could purchase 1,304,000 shares of common at $3.60 per share.

The documents regarding the third transaction were presented to the IDC board of directors at a meeting duly called pursuant to notice on May 11, 1971. At that meeting a majority of IDC's directors were present and those present unanimously approved the terms and conditions of the third transaction and resolved to present to the stockholders the necessary amendment to IDC's certificate of incorporation.

Prior to May 11, 1971 IDC had mailed a notice of its annual meeting to its stockholders calling for the meeting on May 11. Prior to that date the holders of approximately 73% of IDC's outstanding common stock, including the plaintiff Beneficial Standard Corporation, received from IDC copies of all documents relating to the third transaction.

Pursuant to the notice, a meeting of the stockholders of IDC was held on May 11. A quorum of a majority, but not all of the stockholders, was present, and by a unanimous vote of all the stockholders present and voting, the third transaction was approved. At that meeting of stockholders, the following persons were elected directors of IDC: Jordan I. Ross, chairman of the board and chief executive officer; Glenn M. Dekraker, president of IDC and its chief operating officer; Marcus Loew II, vice president and treasurer, Beneficial Standard Life Insurance Co., representing Beneficial Standard Corp.; Edgar F. Heizer, Jr., president, Heizer Corporation, representing Heizer Corporation; Charles L. Palmer, finance vice president, Heizer Corporation, representing Heizer Corporation; Ronald Labow, managing partner Cerebrus Fund, an independent director; Douglas F. Johnston, executive vice president for Investments, Title Insurance Corporation of California, an independent director.

Following the amendment of IDC's certificate of incorporation in connection with the third transaction, IDC's capital structure and the voting rights of its shareholders were: common stock, 3,000,000 shares authorized, 840,010 issued and outstanding and entitled to one vote per share, or 39% of the total votes at a shareholders meeting; preferred stock, 350,000 shares authorized, 300,000 issued and outstanding and entitled to cast 4.4 votes per share for a total of 1,320,000 votes or 61% of the total votes at a shareholders meeting. All of the issued and outstanding preferred stock was (and still is) owned and held by Heizer. None of the common was or is owned by Heizer. Heizer also held the

previously described warrants for 1,304,-000 shares of common at $3.60 per share and IDC's notes for $2,200,000.

In the fall of 1971, IDC required still additional cash to finance the continued operation of its monitoring business. It approached Heizer for an additional investment. On November 12, 1971, Dekraker resigned as a director of IDC as did Johnston on November 16, 1971. As a consequence, on November 19, 1971, when IDC and Heizer entered into an agreement which became the fourth transaction, the IDC board consisted of Ross, its chief executive officer, Loew, representing Beneficial Standard Corporation, Heizer and Palmer, representing Heizer, and Labow, an independent director.

The fourth transaction agreement provided for loans up to $600,000 by Heizer to IDC evidenced by IDC's note payable on demand after March 31, 1972. In the event Heizer loaned the entire $600,000 and the note was not timely paid, it would become convertible into common stock of IDC at $1.00 per share. In the event the note became convertible, the price provisions of the three warrants previously issued to Heizer would again be adjusted so as to decrease the warrant exercise price from $3.60 per share to $1.00 per share and increase the number of common shares purchasable under those warrants from 1,304,000 to 4,694,-400 shares.

The documents comprising the fourth transaction were presented to a meeting of the IDC board held on November 19. Only Ross, Labow, Heizer and Palmer were present. They voted unanimously to approve the fourth transaction. Heizer and Palmer deferred their votes until Ross and Labow voted on the proposal. But the votes of Heizer and Palmer were essential to approval. The board also resolved to recommend to the stockholders the adoption of an amendment to IDC's certificate of incorporation increasing the number of authorized common shares from 3,000,000 to 7,000,000. And they directed that in lieu of a stockholders meeting, written consents to the amendment be obtained as permitted under the Delaware corporation law.

The consents of 52.4% of IDC's common shareholders and 100% of the preferred shareholders (i. e., Heizer), were obtained to the amendment to the certificate of incorporation increasing the number of authorized common shares from 3,000,000 to 7,000,000. Thereafter and pursuant to the terms of the fourth transaction, Heizer loaned IDC $600,000. At the time the loan was funded there was virtually no chance that IDC could repay it by its due date, March 31, 1972.

On March 13, 1972 a meeting of IDC's board of directors was held at which all five of the incumbent directors were present either in person or by telephone. At that meeting, by a vote of 4 to 1 the directors authorized an amendment to the November 19, 1971 agreement providing for an additional loan from Heizer to IDC of an amount up to $250,000. Ross, Labow, Heizer and Palmer voted in favor, Loew, representing plaintiff Beneficial, voted against. The new loan was to be governed by all of the terms of the November 19 agreement. On March 13 Heizer loaned IDC an additional $105,000 pursuant to the amendment. In addition, fees due from IDC to Heizer for management services performed by Heizer under the earlier agreements were accrued and deemed to have been loaned to IDC under the terms of the November 19, agreement, if not paid on March 31, 1972. They were not and IDC issued a convertible demand note in the amount of $114,508 to cover them.

IDC was unable to repay any of the loans or fees pursuant to the fourth transaction by March 31, 1972. As a consequence, all of the fourth transaction notes held by Heizer became convertible into IDC common stock at $1.00 per share, and as a consequence of that, the previously issued warrants held by Heizer became operative at the decreased exercise price of $1.00 per share so as to increase the number of shares purchasable by Heizer to 5,513,000 shares of IDC common representing approxi-

mately 87% of IDC pro forma common stock equity.

To date Heizer has not exercised any warrants or other rights to purchase IDC common stock. Plaintiffs seek to enjoin that exercise and obtain a rescission of the first, second, third and fourth transactions.

At the annual meeting of IDC stockholders held May 25, 1972, the following persons were elected directors of IDC: Jordan Ross, chairman of the board and chief executive officer; Marcus Loew II representing Beneficial Standard Corp.; Edgar F. Heizer, Jr., representing Heizer; Powers Cameron, vice president, Heizer Corporation, representing Heizer; and George Sneed, representing Heizer. On June 21, 1972, Loew resigned.

At a meeting of IDC's board of directors held June 29, 1972, attended by Heizer, Cameron and Sneed, Paul M. Roth was elected president and a director of IDC. On November 20, 1972, Sneed resigned from the board.

On October 11, 1972, this action was commenced.

On June 8, 1973, the board of directors of IDC consisted of Heizer, Cameron, Roth and Ross. On that date IDC required still additional cash to continue the operation of its monitoring business. Accordingly, the board approved a pledge agreement between IDC and Heizer by a vote of 3 to 1, Roth, Heizer and Cameron voting "yes" and Ross "no". Again the votes of Heizer and Cameron were essential to approval. The pledge agreement provided that Heizer would refrain, until January 2, 1974, from making demand for payment of the demand notes totalling $819,508, issued to it by IDC pursuant to the fourth transaction. It also covered some additional non-convertible demand notes which had been issued to Heizer by IDC between April 14, 1972 and April 19, 1973, in the amount of $2,015,000. The agreement further provided that Heizer would make additional demand loans to IDC during the balance of 1973 in the maximum amount of $1,181,700, and the minimum of $460,400, and that Heizer would refrain from making demand for repayment of those additional loans until January 2, 1974. Pursuant to the agreement, IDC pledged all of the stock of its wholly owned and profitable subsidiary, Talent and Residuals, Inc., to Heizer as security for repayment of all loans made by Heizer to IDC on a nonconvertible demand note basis since April 14, 1972, as well as the new loans made pursuant to the pledge agreement. Upon consummation of the agreement, the TR stock was delivered by IDC to Heizer.

By an amended complaint, plaintiffs challenge the fifth or pledge transaction.

### Plaintiffs Maintenance of the Action as Shareholders of IDC

Plaintiffs assert that, as minority common shareholders in IDC, they may maintain this action challenging the foregoing IDC-Heizer securities transactions either derivatively in behalf of IDC, the issuer-seller of the securities, or individually and as representatives of a class of common shareholders who are investors in IDC. They agree that their alternative "investor" theory is bottomed upon *Eason v. General Motors Acceptance Corp.*, 490 F.2d 654 (7th Cir. 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974). They concede, as they must, that they did not directly sell or purchase the securities in question.

Substantively they allege that the entire series of transactions were tainted by conduct prohibited by Rule 10b–5. The full scope of their claimed violations of the Rule will be considered later; suffice it here to say that they assert that material facts concerning the first four transactions were concealed from the shareholders of IDC and that Heizer aided and abetted in that concealment; that in the course of the transactions, Heizer assumed the position of a controlling person or shareholder and owed a fiduciary duty of disclosure to the minority shareholders, which it breached; that Heizer, through the directors it elected to the IDC board of directors engaged in fraudulent self dealing in respect to the fourth and the fifth or pledge transac-

tions; and that the fifth or pledge transaction entered into as it was, subsequent to plaintiffs' challenge here of the first four, was a maneuver patently calculated to frustrate the effectiveness of any remedy which might be granted here in respect to the first four.

Heizer vigorously challenges plaintiffs' right to maintain the action in light of the Supreme Court's decision in *Blue Chip, supra,* and it denies with equal vigor any wrongdoing in connection with the sale to it of the subject securities. It does concede, however, that IDC was an issuer-seller of securities and that the conduct of which plaintiffs complain was in connection with the sales of those securities (including the notes and transfer of TR stock attendant the pledge) by IDC to Heizer.

■ The threshold question to be decided is whether plaintiffs as shareholders in IDC may maintain this action. We believe the answer is clearly that they may derivatively in behalf of IDC.

The history of the judicially created private action under Rule 10b–5 need not be retold here. It had its origin in *Kardon v. National Gypsum Co.,* 69 F.Supp. 512 (E.D.Pa.1946). While judicial interpretations and applications of the substantive scope of the Rule's prohibitions have varied, they have steadily expanded to the end that in *Karvelas v. Sellas,* 376 F.Supp. 1010, 1012 (N.D.Ill. 1974), we observed, "The language of Rule 10b–5 interdicts any act or practice which operates as a fraud or deceit . . . in connection with the purchase or sale of a security." *See, also, Superintendent of Insurance v. Bankers Life and Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971).

The concomitant question of who may complain of an alleged violation of the Rule's prohibitions has also been steadily answered, primarily as the result of the Second Circuit's pilot decision in *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir. 1952), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356. There one Feldman, a controlling shareholder

of Newport, sold his stock at a premium after rejecting a highly profitable offer of merger which he did not communicate to the other shareholders. Plaintiffs, shareholders of Newport, brought an action on behalf of the corporation and all similarly situated shareholders alleging that the transaction operated as a fraud upon the shareholders in connection with the sale of Feldman's stock and that Rule 10b–5 was violated. The district court dismissed the action because the Rule was "aimed only at 'a fraud perpetrated upon the purchaser or seller' of securities and as having no relation to breaches of fiduciary duty by corporate insiders resulting in fraud upon those who were not purchasers or sellers." *Id.* at 463. The court of appeals affirmed similarly concluding that the Rule was "directed solely at that type of misrepresentation or fraudulent practice usually associated with the sale or purchase of securities rather than at fraudulent mismanagement of corporate affairs, and [the Rule] extended protection only to the defrauded purchaser or seller." *Id.* at 464.

Of course, *Birnbaum's* restrictive interpretation of the nature of the fraud prohibited by the Rule has been discarded. *Superintendent of Insurance v. Bankers Life and Casualty Co., supra; Dasho v. Susquehanna Corp.,* 380 F.2d 262 (7th Cir. 1967), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967). However, its conclusion that the Rule extends protection "only to a defrauded purchaser or seller" has survived. *But see, Eason v. General Motors Acceptance Corporation, supra; Karvelas v. Sellas, supra.*

In *Blue Chip Stamps v. Manor Drug Stores, supra,* the Supreme Court for the first time considered *Birnbaum's* purchaser-seller limitation. There plaintiffs were offerees of common shares in a new company organized by defendants under an anti-trust consent decree. Charging that defendants had devised a scheme to discourage plaintiffs from purchasing the shares by materially misleading statements containing an overly

pessimistic appraisal of the new business so that the rejected shares might be offered to the public at a higher price, plaintiffs sued for money damages alleging a violation of Rule 10b–5. The district court, relying on *Birnbaum,* dismissed the action. The court of appeals reversed, holding that the particular facts of the case warranted an exception to the *Birnbaum* limitation. On certiorari the Supreme Court reversed. The Court traced the history and application of the *Birnbaum* dictum, noting without disapproval that shareholders have "frequently [been] able to circumvent the *Birnbaum* limitation through bringing a derivative action on behalf of the corporate issuer if the latter is itself a purchaser or seller of securities." As an example of that circumvention, the Court cited *Schoenbaum v. Firstbrook,* 405 F.2d 215, 219 (2d Cir. 1968), *cert. denied sub nom. Manley v. Schoenbaum,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), in which the Second Circuit declined to apply its own *Birnbaum* limitation to a derivative action by the shareholders of a seller corporation who alleged 10b–5 fraud in the sale of the corporation's securities.

More significant, however, was the Court's citation of the Seventh Circuit's decision in *Dasho v. Susquehanna Corp., supra,* as an example of a reaffirmation by lower federal courts "that the plaintiff class for purposes of . . . Rule 10b–5 private damage action[s] is limited to purchasers and sellers of securities." 421 U.S. at 731–32, 95 S.Ct. at 1923. *Dasho* was a derivative action brought by shareholders of Susquehanna who alleged that the corporation had been defrauded by its directors in both the purchase of its own stock and the sale of stock it owned in another corporation. While the opinion of the court in *Dasho,* which was written by Judge Schnackenberg, made no mention of the *Birnbaum* limitation, a tightly reasoned concurrence by now Chief Judge Fairchild, joined in by Judge Cummings, expressly confronted the limitation and rejected it because derivatively "the corporation is

here suing as a defrauded seller and buyer of securities." 380 F.2d at 270.

Thus, we conclude that the purchaser-seller limitation as examined and rearticulated in *Blue Chip* does not preclude plaintiffs, as shareholders in IDC, from complaining derivatively of injuries to IDC occasioned by conduct prohibited by the Rule in connection with IDC's sale of its securities to Heizer.

Plaintiff's effort to maintain their claim as investors in IDC under *Eason v. General Motors Acceptance Corp., supra,* is a different matter.

At the outset we observe that plaintiffs' investor posture is redundant of their derivative stance to the extent that they complain of injuries inflicted on IDC. But to the extent that they complain of injury to themselves as investors —i. e., holders of securities which they have previously purchased—do they collide with the *Blue Chip* limitation? We believe the answer to this lies in a careful analysis of *Eason* upon which they rely and a further analysis of *Blue Chip* and its recognition and treatment of *Eason.*

In *Eason,* plaintiff, who incidentally was a shareholder in Bank Service, guaranteed obligations of Waite to GMAC when Waite sold its automobile leasing business to Bank Service in exchange for Bank Service's assumption of Waite's primary liability to GMAC and shares of stock in Bank Service. The automobile leasing business failed, Bank Service went into bankruptcy and GMAC sued Eason on his guarantee. Eason responded with a 10b–5 action against GMAC and Waite in which he alleged that the underlying stock transaction between Bank Service and Waite was tainted by the fraud of both Waite and GMAC. As his guarantee was an integral part of the stock transaction, he sought rescission of the guarantee eschewing rescission of the sale of stock because Bank Service was bankrupt.

The district court dismissed Eason's complaint on the authority of *Birnbaum* because he was not the purchaser or seller of the subject securities. On appeal,

the Seventh Circuit Court of Appeals reversed holding that the alleged fraud had been practiced in connection with the sale of Bank Service's stock to Waite and that Eason was a person entitled to the protection of Rule 10b–5 as an investor in Bank Service.

The court of appeals placed particular reliance on the Supreme Court's statements in *Superintendent of Insurance v. Bankers Life and Casualty Co., supra,* that Manhattan Casualty Co. (of which the Superintendent was liquidator) "was injured as an investor" and "suffered an injury as a result of deceptive practices touching its sale of securities as an investor." 404 U.S. at 10, 12–13, 92 S.Ct. at 169. And it concluded that the Court had "repudiated" *Birnbaum* in *Bankers Life.* 490 F.2d at 661.

The court of appeals' ultimate conclusion that *Birnbaum* had been repudiated by the Supreme Court in *Bankers Life* was questionable in view of the fact that Manhattan was clearly a defrauded seller of a security. But in any event, that conclusion cannot withstand the light of *Blue Chip*:

. . . we are of the opinion that *Birnbaum* was rightly decided . . . .

.     .     .     .     .

Available extrinsic evidence from the texts of the 1933 and 1934 Acts as to the congressional scheme in this regard, though not conclusive, supports the result reached by the *Birnbaum* court. . . .

.     .     .     .     .

The *Birnbaum* rule, on the other hand, permits exclusion prior to trial of those plaintiffs who were not themselves purchasers or sellers of the stock in question. . . .

.     .     .     .     .

The virtue of the *Birnbaum* rule, simply stated, in this situation, is that it limits the class of plaintiffs to those who have at least dealt in the security

to which the prospectus, representation, or omission relates. . . .

421 U.S. 731, 733, 742, 747, 95 S.Ct. 1923, 1924, 1928, 1931.

But, plaintiffs argue, *Eason* expressly survived *Blue Chip* by reason of the Court's treatment of it which is found in two places in the *Blue Chip* opinion. First, in support of its earlier quoted passage that federal courts have "reaffirmed *Birnbaum's* conclusion" the Court cited: "Compare *Eason v. General Motors Acceptance Corp.,* 490 F.2d 654 (CA7 1973), cert. denied, 416 U.S. 960, 94 S.Ct. 1979, 40 L.Ed.2d 312 (1974), with *Dasho v. Susquehanna Corp.,* 380 F.2d 262 (CA7), cert. denied [*sub nom. Bard v. Dasho*], 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967)." 421 U.S. at 732, 95 S.Ct. at 1923. Plaintiffs urge that *A Uniform System of Citation* (1967), p. 87, states that "compare . . . with" is used when "the authorities cited, taken together, offer *some support* for statement in text." (Our emphasis.) But *Eason* in tandem with *Dasho* does "offer some support" for the Court's statement. As we have seen, *Dasho* was a derivative suit in behalf of a seller in which *Birnbaum* was embraced. *Eason* was a challenge to a guarantee which was an integral part of a tripartite security transaction. And while the court of appeals rejected the contention that Eason was a seller of either his guarantee or Bank Service's stock or a forced purchaser of the Waite notes held by GMAC, that does not mean that the Supreme Court, in appraising *Eason* approved the investor analysis which the court of appeals adopted. Indeed, as we have noted, while Eason's role as an investor undoubtedly motivated him to give his guarantee, it was quite incidental to the undertaking he sought to avoid.

Furthermore, the Supreme Court's second treatment of *Eason* certainly cannot be stretched to read approval. Having acknowledged the court of appeals' statement that the risk of expanded litigation is not a "reason [to] reject what we believe to be a correct interpretation

of the statute or the rule" (490 F.2d at 660) the Court said:

> But . . . we are not dealing here with any private right created by the express language of § 10b or of Rule 10b–5. . . . However flexibly we may construe the language of both provisions, nothing in such construction militates against the *Birnbaum* rule. We are dealing with a private cause of action which has been judicially found to exist, and which will have to be judicially delimited one way or another unless and until Congress addresses the question. . . .

421 U.S. at 748, 95 S.Ct. at 1931.

With some regret (*see, Karvelas v. Sellas, supra*) we conclude that the *Eason* investor rationale was not approved by *Blue Chip.*

There are other ramifications of *Blue Chip* which require attention, however, before we conclude that plaintiffs may not complain as injured shareholders under the facts presented here.

The Supreme Court carefully delineated the issue there presented: ". . . what limitations there are on the class of plaintiffs who may maintain a private cause of action for *money damages* for violation of Rule 10b–5 . . . ." (421 U.S. 727, 95 S.Ct. 1921. Emphasis supplied). And it took care to note that its "decision in *SEC v. National Securities, Inc.*, 393 U.S. 453, 89 S.Ct. 564, 21 L.Ed.2d 668 (1969), established that the purchaser-seller rule imposes no limitation on the standing of the SEC to bring actions for *injunctive* relief under § 10(b) and Rule 10b–5." (421 U.S. 751, n. 14, 95 S.Ct. 1933. Emphasis supplied.) Furthermore, it is fair to say that the policy arguments mustered by the Court in support of its approval of *Birnbaum* were keyed to its apprehensions of "strike" or *in terrorem* actions for money damages brought by owners of stock who do not sell or offerees who do not purchase allegedly because of overly optimistic or pessimistic representations regarding the future of the business in question. In short, it is clear to us that in *Blue Chip* the Court was concerned

with the prospects of money damage litigation concerning securities transactions which had not occurred.

And so, what of shareholders, such as plaintiffs here, who rather than seeking money damages for the wrong allegedly done them by the fraudulent issuance and sale or threatened issuance and sale of additional securities, seek merely to undo or restrain the wrong? Should they likewise be barred by the purchaser-seller limitation? In this regard we note that at no point in *Blue Chip* did the Court cite, let alone discuss or disapprove a cluster of courts of appeals decisions which appear to have declined to apply the strictures of *Birnbaum* to private 10b–5 actions seeking solely equitable relief. *See Mutual Shares Corp. v. Genesco, Inc.*, 384 F.2d 540, 546–47 (2d Cir. 1967); *Vincent v. Moench*, 473 F.2d 430, 434–35 (10th Cir. 1973); *Kahan v. Rosentiel*, 424 F.2d 161, 173 (3d Cir. 1970); *but see, Greater Iowa Corp. v. McLendon*, 378 F.2d 783, 791 (8th Cir. 1967).

We are tempted by the lure that *Blue Chip* should be confined to its facts and the relief there sought. But we must be mindful of the Court's function in hearing and deciding such cases. It does not sit to adjudicate individual disputes; that is the business of the district courts and courts of appeal. Rather it uses individual cases and controversies to shape and guide the development of the law. This is particularly true where, as here, it speaks in an area of judge made law.

■ Thus, we have concluded that we would not be justified in drawing a distinction here between an action at law and one in equity. Compare Rule 2, Fed.R.Civ.P. And although the elements of uncertainty present in *Blue Chip* are not present here, we should apply its limitations upon the class of persons entitled to maintain any action under Rule 10b–5. Indeed, the Court recognized that consequence when it said that the "three principal classes of potential plaintiffs . . . barred by the *Birnbaum* rule . . . [include] shareholders, creditors, and perhaps oth-

ers related to an issuer who suffered loss in the value of their investment due to corporate or insider activities in connection with the purchase or sale of securities which violate Rule 10b–5." 421 U.S. 737, 738, 95 S.Ct. 1926. Nor does its previously noted tacit approval of a shareholder derivative action on behalf of a corporate issuer-seller mean that shareholders such as plaintiffs can be heard to complain in their own behalf. Accordingly, to the extent that plaintiffs' complaint is dependent on their status as investors in IDC, it will be dismissed.[3]

*The Merits of Plaintiffs' Complaint*

■ Plaintiffs' second amended complaint and their pre- and post-trial briefs are limited to a single theory of recovery: that the previously described securities transactions were tainted by fraud either practiced or aided and abetted by Heizer in violation of Section 10(b) of the Securities Exchange Act of 1934[4] and Rule 10b–5 of the Securities and Exchange Commission.[5] No other theory of relief has been urged. In these circumstances, our conclusion that plaintiffs can maintain their action only as a derivative one in behalf of IDC necessarily limits the scope of our inquiry to whether IDC was victimized by Heizer's alleged misconduct.

The genius of 10b–5 lies in its breadth. It prohibits "any device, scheme or artifice to defraud" and "any act, practice or course of business which operates or would operate as a fraud or deceit . . . ." It prohibits "all fraudulent schemes in connection with the purchase or sale of securities, whether the artifices employed involve a garden type variety of fraud, or present a unique form of deception. Novel or atypical methods should not provide immunity from the securities laws." *A. J. Brod & Co. v. Perlow,* 375 F.2d 393, 397 (2d Cir. 1967). Despite *Birnbaum's* early conclusion that the Rule was not aimed at "fraudulent mismanagement of corporate affairs" (193 F.2d at 464), we know today that a breach of trust by corporate fiduciaries clearly falls within its ambit. *Superintendent of Insurance v. Bankers Life and Casualty Co., supra; Dasho v. Susquehanna Corp., supra,* and *Dasho v. Susquehanna Corp.,* 461 F.2d 11 (7th Cir. 1972); *Schoenbaum v. Firstbrook, supra.*

But the breadth of the Rule's prohibitions does not permit its application to transactions in connection with which there has been no fraud practiced upon the person enjoying the protection of the Rule. Here that person is IDC.

■ When we examine plaintiffs' proof in respect to the first three transactions we find it wanting. IDC was in need of cash which Heizer was willing to provide. Heizer drove a hard bargain, particularly in respect to the third transaction. But nothing was concealed from IDC's directors, who were independent

---

3. This conclusion renders moot plaintiffs' motion to certify a class of shareholders of IDC.

4. Section 10(b) provides in material part:

It shall be unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities and Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors. 15 U.S.C. § 78j(b).

5. Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate, or of the mails, or of any facility of any national securities exchange:

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

of Heizer, although subject to its weighted preferred shares vote following the second transaction. Nor was anything concealed from IDC's independent and able counsel. For all that appears here the first three transactions were open and at arms length vis-a-vis Heizer and IDC.

Plaintiffs' primary complaint in regard to the first three transactions is that their terms and the consequences thereof were concealed from IDC's common stockholders. And this is particularly true, they assert, in respect to the fact that the anti-dilution clauses in the warrants would be triggered not only by sales of common stock to outsiders but also by sales of common stock to Heizer under the terms of the later warrants which were issued at successively lower prices. Heizer, say plaintiffs, through its orchestrating officers and counsel, aided and abetted that concealment. Alternatively they urge that Heizer itself owed a duty of disclosure to the stockholders because it had assumed control of IDC through the continuation of business provisions of the agreements, its weighted preferred shares votes and the anti-dilution clauses which discouraged other investors and rendered IDC a captive investee.

■ This theory of fraud by concealment practiced on the shareholders is not available to plaintiffs under our interpretation and application of the *Blue Chip* limitation on the persons protected by Rule 10b–5. But if it were, the proof does not sustain the charge.

The terms and consequences of the first three transactions were not concealed from the stockholders. All of the stockholders meetings were held pursuant to notice. The notices and accompanying summaries described the business to be transacted at each meeting. The documents pertaining to the three transactions were made available to the shareholders prior to each meeting. The transactions were discussed at each meeting. All three transactions were unanimously approved by the stockholders in attendance and voting. None of the transactions was challenged until this action was brought following the fourth transaction.

We find and conclude that the first three transactions were not tainted by any 10b–5 fraud of which plaintiffs can be heard to complain.

■ The fourth and fifth transactions are quite different. By the time they were entered into Heizer had put its agents on IDC's board and their votes were essential to the consummation of these transactions. Clearly, in these instances Heizer engaged in self dealing while occupying a fiduciary relationship to IDC. As such, if the transactions were not *per se* rescindable, at the very least Heizer had the heavy burden of proving their fairness. This it failed to do.

■ On the eve of the fourth transaction, Heizer held warrants to purchase 1,304,000 shares of IDC's common stock at $3.60 per share. By its additional investment of only $600,000, Heizer increased its claim on IDC's common equity to 4,694,000 shares at $1.00 per share and thereafter by additional demand loans which IDC had no likelihood of timely repaying to 5,513,000 shares at $1.00 per share.

Heizer's officers are experts at valuing corporations such as IDC. At the time of the fourth transaction, Heizer valued IDC common stock at $3.60 per share. This admission without more shows the gross inadequacy of the $1.00 per share price imposed upon IDC by the fourth transaction convertible note.

In addition, Heizer's audited statement for fiscal 1972, which was the year of the fourth transaction, confirmed that Heizer's valuation of IDC was the "fair value," and Edgar Heizer admitted that in November, 1971, when the fourth transaction was entered into, Heizer could have liquidated its investment in IDC at cost.

Heizer offered no evidence which discredited its valuation of IDC at $3.60 per share. Rather its witnesses testified that the $1.00 per share price in the

fourth transaction was the result of a formula designed to equate Heizer's pro forma equity to the percentage which its investment bore to IDC's total capital. Such an approach is hardly consistent with Heizer's obligation to deal fairly with IDC.

Insofar as the fifth or pledge transaction is concerned, Heizer's conduct was even more rapacious. In June, 1973 Heizer had the power through the warrants and convertible notes issued to it in the first four transactions, to capture 87% of IDC's equity and thereby capture the profitable TR. By then, plaintiffs had brought their action here challenging that threatened equity takeover. And so Heizer, by agreeing to refrain from demanding payment of the fourth transaction notes as well as some $2,000,000 which it had loaned IDC in the interim to keep the monitoring business afloat, took a pledge of all of the TR stock which Heizer's valuation committee had just valued at $8,000,000.

There was no evidence which even suggested that the pledge transaction was fair. Indeed, Heizer's witness Cameron admitted that IDC could not have repaid any of the notes secured by the pledge out of internally generated funds or any known outside financing source, and that the pledge was taken in order to protect Heizer from the outcome of this litigation which was pending in behalf of IDC. It is difficult to conjure a more blatant breach of trust. *Pepper v. Litton*, 308 U.S. 295, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Lebold v. Inland Steel Co.*, 125 F.2d 369 (7th Cir. 1941).

### The Relief

█ District courts have the duty "to provide such remedies as are necessary to make effective the congressional purpose" in actions such as this. *J. I. Case Co. v. Borak*, 377 U.S. 426, 433, 84 S.Ct. 1555, 1560, 12 L.Ed.2d 423 (1964). The relief may include setting aside or enjoining the enforcement of rights purportedly created by the tainted transaction. *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

Here plaintiffs seek only equitable relief by way of injunction, rescission and reformation. The rights of innocent parties have not intervened. Defendant Heizer has not exercised the warrants issued to it in the first three transactions or converted the note of the fourth. Nor has it foreclosed the pledge of the fifth transaction. Thus, there is no unscrambling to be done and we are not inhibited by any practical or countervailing equitable limitations which would militate against granting all of the relief warranted by our conclusion on the merits.

The primary thrust of the lawsuit has been directed at the increased claims upon IDC's equity which Heizer has acquired through the second, third and fourth transactions, and to safeguard IDC's stock ownership of TR. In view of the fact that we have found and concluded that only the fourth and fifth or pledge transactions are vulnerable to plaintiffs' challenge, the relief should be limited to those transactions.

█ The notes of the fourth transaction should be declared nonconvertible and Heizer should be permanently enjoined from converting or attempting to convert any of those notes to shares of common stock of IDC. Any provision of the fourth transaction which authorizes or permits either directly or indirectly an increase in the number of shares of common stock of IDC issuable upon exercise of warrants held by Heizer under the first three transactions in excess of 1,304,000 shares, should be declared void. Similarly, any provision of the fourth agreement which authorizes or permits Heizer to exercise the previously issued warrants at a price of less than $3.60 per share, should be declared void and Heizer should be enjoined from seeking to enforce those provisions of the fourth transaction.

The stock pledge agreement of June 8, 1973, between Heizer and IDC should be cancelled and declared void and Heizer should be ordered to transfer to IDC all

certificates representing shares of stock of TR held by Heizer pursuant to the stock pledge agreement. Heizer should also be ordered to release any and all security interest in the shares of TR and it should be enjoined from enforcing in any way the stock pledge agreement.

In addition, because of the dominant position which Heizer holds in relation to IDC and its clear over-reaching manifested by the fourth and fifth or pledge transactions, Heizer should be enjoined from entering into any transaction with IDC except upon terms and conditions as shall be fair and equitable.

Plaintiffs' prayers for relief in respect to the first three transactions should be denied.

In view of the nature of these proceedings, the court will entertain an application by plaintiffs for an award of reasonable attorneys' fees.

Because a counterclaim remains pending, brought by IDC against plaintiffs, the court will direct the entry of judgment in accord with the foregoing, pursuant to Rule 54(b) of the Federal Rules of Civil Procedure. A decree to that effect has been entered this date.