Peter **WRIGHT** and **Beneficial Standard Corporation, Plaintiffs-Appellants,** * **Cross-Appellees,**

v.

The **HEIZER CORPORATION, Defendant-Appellee, Cross-Appellant,**

and

**International Digisonics Corporation, Defendant-Appellee.**

Nos. 76–1140, 76–1700, 76–1701 and 76–1702.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 10, 1976.

Decided June 30, 1977.

As Modified Sept. 9, 1977.

---

\* Plaintiffs in the derivative action (see the first paragraph of the text) filed the first notice of appeal (No. 76–1139) but later dismissed that appeal voluntarily. Thus, Heizer Corporation, although its role is essentially that of an appellant, is labelled the appellee and cross-appellant and plaintiffs are labelled the appellants and cross-appellees in the appeals filed in that action, which are Nos. 76–1140, 76–1700, and 76–1702. In No. 76–1701, an appeal from a separate action by Beneficial Standard Corporation against International Digisonics Corporation (see the first paragraph of the text), Beneficial is the appellant and IDC is the appellee.

Edward Slovick, James S. Gordon, Theodore M. Becker, J. Samuel Tenenbaum, Chicago, Ill., for Wright and Beneficial Standard.

Max Wildman, Bernard Harrold, Jerald P. Esrick, Robert E. Kehoe, Jr., Chicago, Ill., for defendant, Heizer Corp.; Ray Garrett, Jr., Wildman, Harrold, Allen & Dixon, Chicago, Ill., of counsel.

Before CASTLE, Senior Circuit Judge, and TONE and WOOD, Circuit Judges.

TONE, Circuit Judge.

These consolidated appeals arising out of a single case present issues under § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j, and Rule 10b–5 thereunder. Both plaintiffs join in a shareholders' derivative claim, asserting that the dominant shareholder defrauded the corporation in a series of five securities transactions. In addition, one of the plaintiffs asserts a claim against the corporation itself, alleging that false representations by one of the corporation's officers induced that plaintiff to convert a debenture into common stock.

## I.

### The Derivative Claim

#### A. Facts

International Digisonics Corporation (IDC) was formed in 1969 to develop electronic monitoring of television commercials as a service for the advertising industry. IDC's founder was Jordon Ross, who since 1962 had been successfully operating a company called Talent & Residuals, Inc. (T&R), which provided advertising agencies with the complex accounting and payroll services required by the "residuals" paid to actors performing in television commercials.

The first investor in IDC, plaintiff Beneficial Standard Corporation, purchased a $425,000 convertible IDC debenture on the condition that the well-established and profitable T&R be made a subsidiary of IDC. In anticipation of a planned public offering of its stock, IDC requested that Beneficial convert its debenture to IDC common stock, at a $2.50 per share exchange ratio. This conversion is the subject of the individual action, discussed in Part II, *infra*. After the conversion, Ross and

Beneficial owned approximately two-thirds of the corporation's stock; the remaining third was held by Ross' friends and business associates.

As originally conceived, electronic monitoring involved encoding film or videotape commercials with electronic impulses which, while invisible to the viewer, could be read by electronic monitors. Placed in all major television markets, these monitors would report to a central computer, which would then use the data to generate a proof-of-performance report. This report would replace the affidavits from television stations that the advertising agencies were relying upon as proof that their commercials had been properly broadcast at the agreed-upon time.[1]

In the fall of 1969 IDC was seeking a $1,000,000 capital contribution from a private investor as a preliminary step to taking the company public. One investor it approached was defendant Heizer Corporation, which specializes in venture capital investments in newly-formed companies considered too risky for Heizer's stockholders—banks, pension funds, and universities—to invest in directly. Heizer was told that, provided FCC approval could be obtained, its $1,000,000 investment would enable the monitoring business to reach the break-even point necessary for a successful public offering. They were also told that, given a $5,000,000 capital investment from that public offering, a $5,500,000 profit could be anticipated from the monitoring business by 1971. [Pl. Ex. 62, Heizer Pre-Investment Summary & Analysis.] These "exceptional" prospects, coupled with the protection afforded by T&R's consistently good performance, convinced Heizer that IDC was a desirable investment opportunity. [*Id.*]

---

1. It was hoped that eventually the monitoring system could be used to perform more sophisticated functions such as market research and could also serve as an automated data-gathering system for a fully computerized T&R payroll system and a billing system between advertising agencies and television stations. [Jordon Ross, Tr. 207; Pl. Ex. 66, Heizer Corp. Business Appraisal Report, Aug. 1970. Occasional citations to the record and briefs of the parites are included in brackets in this slip opinion for the convenience of counsel and other representatives of the parties in their study of the opinion. Since the materials cited will ordinarily not be available to others, these bracketed citations will serve no further purpose when the opinion is published in the Federal 2d reports, and they, as well as this bracketed explanation, will therefore be deleted before the opinion is submitted to the publisher.]

Heizer offered to purchase IDC preferred stock, accompanied by warrants to purchase common stock, for $1,000,000; it also agreed to loan IDC $500,000 for one year. Following unanimous approval of this first transaction by the board of directors and stockholders of IDC on November 9, 1969, Heizer was issued 100,000 shares of a newly-created class A common stock (in reality a preferred stock) at $10 per share and warrants to purchase 155,000 shares of common stock at $8.50 per share. Although the preferred stock was not made expressly convertible, it was redeemable at Heizer's option and could be used at par in lieu of cash in exercising the warrants. During negotiations, the proper exercise price of the warrants was hotly disputed, with Jordan Ross, who negotiated for IDC, insisting on at least $10 per share and Heizer offering only $5 per share. The dispute was settled by compromising on the price and adding to the warrants an "antidilution clause"—or, as a Heizer vice-president called it, a price-adjustment clause—which would automatically readjust the price downward and the number of shares purchasable upward if IDC sold stock or rights to stock at a price lower than $8.50 per share.[2] The agreement also contained a number of other provisions designed to protect the Heizer investment, including IDC's agreement not to pledge its T&R stock or to change the nature of its business without Heizer's consent.

The contemplated public offering did not take place, however. Over the next eleven months IDC encountered a number of technical problems with monitoring, as well as administrative delay. At last, in April 1970, the FCC ruled favorably on the company's request for rulemaking, and in June 1970, IDC began actively marketing its services. [DeKraker monthly memos to IDC board, Def. Ex. 1(b)–1(i).] Although a public offering was still contemplated [Def. Ex., 24], IDC was by this time also investigating other financing alternatives.[3] Needing additional operating capital immediately, IDC turned once again to Heizer. In September 1970 the second transaction, a $2,000,000 investment in two takedowns of $1,000,000 each, was arranged on the same general basis as before and was unanimously approved by IDC's board and shareholders. Heizer was to receive 200,000 shares of a new preferred stock at $100 per share,[4] with warrants to purchase 400,000 shares of common stock at an initial exercise price of $6 per share. If IDC had not met certain conditions not relevant here at the time of the second takedown, the price of the warrants would drop to $4 per share.[5] These warrants had an antidilution clause identical to that used in the first transaction; however, Heizer waived the antidilution provision in its first set of warrants so that their exercise price remained at $8.50 per share. [C. Palmer, Tr. 1903.]

In the next six months IDC was faced with more technical problems: film commercials often could not be monitored because of improper coding by film processors or improper alignment in broadcasting, and the apparent solution to these problems could not be implemented without a new ruling from the FCC. However, in his reports to IDC's board, the president of the company, Glenn DeKraker, stated that mon-

2. The formula for determining the new number of shares purchasable is:

$$\frac{\text{old exercise price} \times \text{old number of warrants}}{\text{new exercise price}}$$

3. There is disagreement over why none of these efforts ever produced concrete results: Heizer officers testified that Jordon Ross always insisted on unrealistic prices for the stock [E. Heizer, Tr. 994; C. Palmer, Tr. 1889], while an IDC director testified that rapidly deteriorating market conditions, the restrictive provisions in the first Heizer financing, and IDC's own operational difficulties made it impossible to ac-

quire financing on a reasonable basis. [R. La Bow dep. 61–62.]

4. The Class A common stock created in the first transaction was also exchanged for the new preferred stock in this transaction.

5. In February 1971 Heizer, while proceeding with the second takedown, notified IDC that it was in default and that the warrant exercise price had therefore dropped to $4 per share. [Pl. Ex. 65.] IDC responded, denying default. [Def. Ex. 35.] The matter was never resolved.

itors had been placed in all twenty-five top markets and that, while the system was turning out to be more complex than originally thought, it was being successfully debugged. [Def. Ex. 1(j)–1(n).]

In May of 1971, after several possible alternative sources of financing had fallen through, IDC again found it necessary to turn to Heizer for a third financing. IDC's board and stockholders again unanimously approved a transaction in which Heizer invested $1,700,000 ($500,000 of which was used to repay the Heizer loan due May 25th) in return for a twenty-year note in that amount and warrants to purchase an additional 472,222 shares of common stock at $3.60 per share. The prior antidilution clauses were partially triggered and, as a result, Heizer became entitled to 1,304,000 shares at $3.60 per share,[6] or a total of 61 per cent of the company's equity. In order to equate Heizer's voting power with this *pro forma* equity position, IDC's charter was amended to provide that the preferred stock would receive 4.4 votes per share. [E. Heizer, Tr. 660.] Two Heizer officers, Edgar Heizer and Charles Palmer, also became members of the IDC board at this time.

Over the next six months, IDC continued to experience technical difficulties with film encoding while pursuing a constant search for financing from sources other than Heizer. [Def. Ex. 1(o)–1(u).] The most promising source in the summer and fall of 1971 was the underwriting firm of McCormick & Co. Impressed by IDC's profit projections and by Heizer's substantial commitment to the company [Tr. 1687], McCormick issued a letter of intent in October 1971 looking toward a public offering. [Def. Ex. 78.] Because it appeared that $1,500,000 would be needed before such an offering could be made, McCormick also agreed to attempt to locate private investors. By November, these efforts had not proved successful and IDC's financial situation was desperate. Again, IDC looked to Heizer for an interim financing of up to $600,000 to be repaid from the private placement, which was not expected to materialize in January. [Tr. 179–180, 995, 1620.] An agreement was reached whereby Heizer would lend IDC up to $600,000, payable on demand after March 31, 1972; if the full amount had been lent and not repaid by that date, the loan would become convertible to common stock at $1 per share.[7] At that point the antidilution clauses in the warrants from the previous three transactions would be triggered and Heizer would become entitled to 4,694,400 shares of IDC common stock at $1 per share, or approximately 85 per cent of the corporation's equity.

The resignation of two directors from the IDC board[8] and the absence from the country of another, who was Beneficial's representative, left only four participating directors, two of whom were Heizer nominees, when a board meeting was held on November 19, 1971. Because of their conflict of interest, the Heizer nominees allowed the two independent directors to vote first, after telling them that there would be no transaction if either of them disapproved. The vote was unanimous in favor of the proposal.

---

6. This figure is 200,000 shares less than Heizer might have insisted upon receiving. At $3.60 per share Heizer was entitled to 365,972 shares under the warrants issued in the first transaction; a Heizer vice-president testified that this figure was negotiated down to 276,223 shares. [C. Palmer dep. 216.] The warrants from the second transaction would have entitled Heizer to 666,666 shares if the price had originally been pegged at $6 per share or 444,444 if pegged at $4 per share. At this point the parties apparently split the difference on price and triggered at $5 per share or 555,555 shares.

7. Heizer vice-president, and IDC director, Charles Palmer testified that the purpose of the $1 conversion price was to provide IDC with a strong incentive to obtain outside financing or, in the event the financing fell through, to give Heizer what it considered to be a fair percentage of the company's equity. [C. Palmer dep. 137–138, 148–150.]

8. Edgar Heizer testified that he had refused to consummate the transaction unless one of these two, Glenn DeKraker, was removed from both the board and his position as president of the company. [Tr. 1009.]

Once the board had approved this fourth transaction, it was necessary to obtain the common shareholders' approval of a charter amendment increasing the number of authorized shares of common stock from three to seven million. Counsel for Heizer and for IDC testified that, because of the company's pressing need for immediate financing, they decided that the best procedure was to obtain written consents from a majority of the stockholders, as permitted by the law of Delaware, the state in which IDC was incorporated. [Tr. 1135, 1629–1630, 1784.] Because Beneficial opposed the transaction, the consents had to be secured from Jordon Ross and his friends and business associates. Ross made the necessary contacts himself, obtaining consents from shareholders (including plaintiff Peter Wright) holding 52.4 per cent of the corporation's outstanding common stock.

In December 1971 McCormick & Co. informed IDC that it would not be able to arrange financing. One month later it became apparent that film monitoring was not technically feasible. After a period of re-evaluation, Heizer decided that the monitoring effort should focus on the feasibility of videotape monitoring, and, so limited, should be continued while a search for new management was conducted. [Def. Ex. 95, 100–101, 103–108, 111–112.]

By March 13, 1972, IDC had borrowed the entire $600,000 authorized in the fourth transaction and was again in need of funds. At that point the IDC board, with the Beneficial nominee dissenting, authorized an amendment to the November 19th agreement whereby Heizer would lend the company up to $250,000 more and the amount lent, plus unpaid management fees and interest, would also become a loan convertible to common stock at $1 per share if not paid by March 31, 1972. On March 31 IDC had not repaid any of these loans, and Heizer therefore gained the right to purchase 5,513,908 shares of IDC common stock, or 87 per cent of the company's equity on a *pro forma* basis, at $1 per share.

A new board of directors, consisting of three Heizer nominees, a representative of Beneficial, and Jordon Ross, was elected in May 1972. The Beneficial director, however, resigned less than a month later. In June 1972, Paul Roth was elected president of the company by the three Heizer directors voting in Jordon Ross' absence and apparently over his objections. Roth was given six months to study the viability of a videotape-only monitoring system. [P. Roth, Tr. 301.] In the meantime, from April 14, 1972 to April 19, 1973, Heizer extended $2,015,000 in non-convertible demand loans to IDC to make up the difference between its operating losses and T&R's profits.

In October 1972, Beneficial and Peter Wright, an individual shareholder, filed this derivative action. In their complaint, twice amended, they alleged that Heizer had effectively gained control of IDC through the protective provisions of the first transaction and had then violated Rule 10b–5 by failing to disclose to IDC's shareholders its controlling position and the unfair valuation placed on IDC stock in the second, third, and fourth transactions. Alternatively, they alleged that Heizer, if not in control of IDC, had aided and abetted IDC's management in its failure to disclose material facts concerning the four transactions. They also alleged that Heizer was liable as a controlling person for the actions of its nominees on the IDC board in voting for the allegedly unfair and improperly disclosed fourth transaction.

In June 1973, while this case was pending, the fifth transaction now complained of was consummated. Paul Roth and Heizer officers testified that they had found it impossible to arrange outside financing without recapitalizing the corporation. Once this suit was filed, recapitalization, which would have involved exercise of the disputed warrants, also became impossible. Heizer was thus left as IDC's sole source of financing. Edgar Heizer testified that because Heizer Corp. is not in the business of making unsecured loans, it was at that point "totally justified" in demanding security for its continued support of the business—even though its investment was not

in any immediate danger. [Tr. 933, 936–937.] The security it received for all its loans after April 14, 1972 was a pledge of all the stock of T&R. In return, Heizer agreed to postpone demand on the various short-term and demand loans extended pursuant to, and after, the fourth transaction until January 1974 and agreed to lend the company a minimum of $460,000 and a maximum of $1,181,700 during the remainder of 1973, also to be secured by the pledge and payable in January 1974.

Paul Roth testified that he was told one purpose of the pledge was to "smoke [plaintiffs] out of the woodwork," [Tr. 1291] apparently by threatening to foreclose on IDC's most profitable asset, T&R. In count II of their second amended complaint, plaintiffs challenged this pledge transaction, alleging that Heizer had demanded the pledge as protection against the outcome of the litigation and that this use of its control over the corporation constituted a manipulative and deceptive device operating as a fraud on IDC in violation of Rule 10b–5.

B. *The District Court Opinion*

In *Wright v. Heizer Corp.*, 411 F.Supp. 23 (N.D.Ill.1975), the District Court held that plaintiffs could maintain a derivative action on behalf of IDC but ruled that, in light of the Supreme Court's re-affirmance of the *Birnbaum* purchaser-seller standing requirement in *Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975), they could not sue personally as shareholder-investors in IDC. The court then ruled that the first three transactions, which it found to be "open and at arm's length," could not be attacked on the ground that they had not been fully disclosed to the shareholders because under the *Blue Chip* limitation "[t]his theory of fraud by concealment practiced on the shareholders" was not available. 411 F.Supp. at 36. The court went on to hold, however, that even if the theory were available, plaintiffs had failed to provide proof of nondisclosure.

With respect to the fourth and fifth transactions, the court held that because Heizer was a fiduciary engaged in self-dealing in the sale of securities, it had the "heavy burden of proving [the] fairness" of those transactions. *Id.* Finding its proof inadequate, the court ordered the notes from the fourth transaction declared nonconvertible, cancelled any warrants issued in connection with that transaction, declared void the triggering of the prior warrants, and cancelled the pledge of T&R stock. Heizer was also enjoined from purchasing securities from or lending money to IDC in the future under conditions that were not "fair and equitable."

On appeal, plaintiffs do not challenge the District Court's ruling on the first three transactions. By means of the appeal in No. 76–1700 from an order denying a petition for supplemental relief, they challenge the scope of the relief granted, arguing that the court also should have forced Heizer to assume a portion of IDC's monitoring losses by requiring it to give up its senior position. In No. 76–1140, Heizer challenges the court's ruling on liability under 10b–5; it also argues that, even if that ruling was correct, the court erred in granting overly broad prospective relief. Finally, in No. 76–1702, Heizer appeals from an order entered after the District Court's decision, enjoining it pending appeal from proceeding with a proposed recapitalization plan.

C. *The Applicable Law*

In voiding the unfair portions of the fourth and fifth transactions, the District Court held that a "breach of trust by corporate fiduciaries clearly falls within [the] ambit" of Rule 10b–5. 411 F.Supp. at 35. The court then found that the Heizer nominees were directors whose votes were necessary to the approval of the transactions and therefore imposed on the defendant the burden of proving that its self-dealing had been fair. *Cf. Shlensky v. South Parkway Building Corp.*, 19 Ill.2d 268, 166 N.E.2d 793 (1960). On appeal, plaintiffs did not seek to support the District Court's judgment with the fairness analysis the Second Circuit adopted in *Green v. Santa Fe Industries, Inc.*, 533 F.2d 1283 (2 Cir. 1976), decided by

that court after Judge Marshall's decision and reversed by the Supreme Court after oral argument before us in the case at bar, *Santa Fe Industries, Inc. v. Green,* 430 U.S. 462, 97 S.Ct. 1292, 51 L.Ed.2d 480 (1977). See also *Marshel v. AFW Fabric Corp.,* 533 F.2d 1277 (2d Cir.), *vacated and remanded for a determination of mootness,* 429 U.S. 881, 97 S.Ct. 228, 50 L.Ed.2d 162 (1976). Perhaps anticipating the Supreme Court's reversal in *Green,* plaintiffs instead advanced an argument similar to the District Court's rationale. They argued that self-dealing by a corporate fiduciary that results in the sale of securities for a grossly inadequate consideration has been considered fraud in connection with the sale of such securities since the Second Circuit's *en banc* decision in *Schoenbaum v. Firstbrook,* 405 F.2d 215 (1968), *cert. denied,* 395 U.S. 906, 89 S.Ct. 1747, 23 L.Ed.2d 219 (1969), and in this circuit since the decision in *Jannes v. Microwave Communications, Inc.,* 461 F.2d 525 (1972). See also *Superintendent of Insurance v. Bankers Life & Casualty Co.,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971). Thus, they argued, findings of a fiduciary duty and gross unfairness in the price of securities sold to the fiduciary are sufficient to establish liability under Rule 10b–5, without proof of deception or nondisclosure of material facts.

■ In light of the Supreme Court's decision in *Green,* the District Court's reasoning cannot stand, and the plaintiffs' argument must be rejected. In *Green* the Court pointed out that *Schoenbaum,* and the cases following it, all "involved an element of deception," 97 S.Ct. at 1301 n. 15, and thus "do not support the proposition . . . that a breach of fiduciary duty by majority stockholders, without any deception, misrepresentation, or nondisclosure, violates the statute and the Rule." *Id.* 97 S.Ct. at

1302. Moreover, in interpreting § 10(b) of the 1934 Act and Rule 10b–5 thereunder, the Court held that "once full and fair disclosure has occurred, the fairness of the terms of the transaction is at most a tangential concern of the statute." The Court said that "[A]bsent a clear indication of congressional intent," it was "reluctant to federalize the substantial portion of the law of corporations that deals with transactions in securities" in order to create a parallel federal remedy for unfairness. *Id.* 97 S.Ct. at 1303–1304.

■ While attempting to support the District Court's reasoning in the case at bar, plaintiffs have also argued that Heizer is liable under Rule 10b–5 because it deceived the IDC stockholders, and thus IDC itself, by not informing them of the terms of the fourth and fifth transactions. Heizer has replied to this argument, both here and in the District Court. We are of course free to affirm the District Court's judgment on grounds other than those relied upon by that court.[9] *Dandridge v. Williams,* 397 U.S. 471, 475 n. 6, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970).

D. *Violation of Rule 10b–5: Duty to Disclose and Materiality*

1. *The Fourth Transaction*

■ In *Birnbaum v. Newport Steel Corp.,* 193 F.2d 461 (2d Cir.), *cert. denied,* 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952), Judge Augustus Hand established the familiar principle, since adopted by the Supreme Court, *Blue Chip Stamps v. Manor Drug Stores, supra,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539, that only a defrauded purchaser or seller has standing to sue under Rule 10b–5. A corporation issuing securities, such as the warrants here, is a

---

**9.** We are not persuaded by plaintiffs' argument that the District Court made findings of fact on the issues of disclosure and control. In denying defendant's motion to dismiss at the close of plaintiffs' case, Judge Marshall did say that he believed "the evidence at this posture of the case would warrant findings in favor of the plaintiffs with respect to nondisclosure, control by Heizer, unfairness with respect to the fourth

transaction and the pledge agreement." But he also stated that he had not "by any means started to make up [his] mind on the total merits of the case" and had not weighed the evidence. [Tr. 1518–1519.] Inasmuch as the judge did not mention these issues in his published opinion, we cannot treat these remarks as findings of fact subject to the "clearly erroneous" rule.

"seller" of those securities for purposes of the *Birnbaum* rule, and its interest may be asserted in a derivative action. *E. g., Dasho v. Susquehanna Corp.*, 461 F.2d 11 (7th Cir.), *cert. denied*, 408 U.S. 925, 92 S.Ct. 2496, 33 L.Ed.2d 336 (1972). When no shareholder approval is required for the transaction, disclosure to the board of directors is disclosure to the corporation, at least when, as here at the time of the fourth transaction, a majority of the board is disinterested. *Dasho v. Susquehanna Corp., supra*, 461 F.2d at 24–26. Compare *Bailey v. Meister Brau, Inc.*, 535 F.2d 982 (7th Cir. 1976). When shareholder approval is required by state corporation law, however, it is the shareholders who represent the corporation and it is they who are entitled to disclosure of all material facts. See *Dasho v. Susquehanna Corp., supra*, 461 F.2d at 24; *Popkin v. Bishop*, 464 F.2d 714, 720 (2d Cir. 1972); Sherrard, *Fiduciaries and Fairness Under Rule 10b–5*, 29 Vanderbilt L.Rev. 1385, 1427 (1976).

■ In the case at bar, one critical element of the fourth transaction, the charter amendment increasing the number of authorized shares of common stock from three to seven million, required shareholder approval.[10] Under Delaware law, such an amendment must be approved by a majority of the common shareholders voting as a class. Del.Code Ann., title 8, § 242(c)(1) and (c)(2). Because Heizer held no common stock, never having exercised any of its warrants, this requirement meant that IDC's independent shareholders had the power to refuse the amendment and thereby block the entire transaction. Before deciding whether to exercise this power, the shareholders were entitled to full disclosure of all material facts concerning the transaction.

The record indicates that full disclosure was not made. The form of consent that plaintiff Peter Wright and other shareholders signed and the notice to shareholders who had not signed were uninformative, stating only that the number of common shares would be increased from three to seven million by action of the shareholders voting as classes. Jordon Ross, who obtained all but one of the consents, testified that he told most of the shareholders he spoke to that the amendment was necessary for financing. The meetings were conducted hastily and the only information he volunteered to anyone was the amount of the financing involved. [Tr. 230–233.] Wright corroborated Ross' account, testifying that Ross did not tell him Heizer was the source of the financing or that the deal involved anything more than a simple purchase of stock. [Tr. 1405.]

In arguing a motion to dismiss at the close of plaintiffs' case in the District Court, Heizer contended that this disclosure was sufficient. From the documents submitted to them, the shareholders knew that there was a possibility that their equity position could be seriously eroded. Heizer argued that this knowledge should have prompted them to solicit more information from Jordon Ross, who presumably had ready access to all the material facts.

We find this argument unpersuasive. Although the shareholders knew that dilution was a possibility, they did not know what the terms of the transaction were, how Heizer had arrived at the $1 per share valuation, or what alternative would be available to IDC if the transaction could not be consummated. Despite the reference to voting by classes, there is no evidence that the shareholders knew that a majority of their votes were necessary for passage of the amendment: knowing, as they apparently did, that Heizer was a major power in the corporation, they may have assumed that the 300,000 votes indicated for Heizer

---

10. Without the amendment, IDC would have been able to issue warrants for only 2.16 million, instead of 4,694,400, shares (three million minus the approximately 840,000 shares held by independent shareholders). Thus, Heizer could not have obtained a warrant exercise price of less than $2.20 or a *pro forma* equity position greater than 72 per cent. And, so long as the three million share ceiling was maintained, additional convertible investments would have merely increased the price per share rather than the number of shares purchasable.

at the bottom of the consent form were sufficient to carry the proposal. All these facts would be "material" in a sense that "there is a substantial likelihood that a reasonable shareholder would consider [them] important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976). Indeed, without this information the shareholders could not possibly have made an intelligent decision on the proposed charter amendment. To impose a duty of inquiry on them under these circumstances would be to encourage concealment rather than the full disclosure Rule 10b–5 requires.

■ Although Heizer did not control the IDC board at the time of the fourth transaction, it assumed responsibility for the inadequacy of the disclosure when it undertook to control and supervise IDC's communications to its shareholders. Heizer's counsel, Bernard Kury, testified that he drafted the closing documents for all four transactions, as well as whatever board or shareholder resolutions he considered necessary for IDC's approval of the transactions. In the second and third transactions, when he found notices of IDC shareholder meetings, prepared by IDC counsel and mailed without his prior approval, to have been inadequate, Kury himself drafted waiver of notice forms and directed IDC counsel to have them signed by all the shareholders. [Tr. 1092, 1105, 1109.] [11] In the fourth transaction he drafted the shareholder consents approving the increase in the number of authorized shares, as well as the notice of shareholder action that was mailed to those who did not sign the consent form.

In the first three transactions Heizer was a lender to, and shareholder of, a corporation it did not control and on whose board it was not represented. We may assume that as such it was entitled to act solely in its own interest in dealing with IDC's management, whose responsibility it was to advise the shareholders. By the time of the fourth

transaction, however, Heizer had gained voting control of IDC and had placed two of its officers on IDC's board of directors. Thus it stood in a fiduciary position and could no longer act for itself alone. When Heizer chose to continue its participation in communications to the IDC shareholders, it owed them the duty of full disclosure. As we have already noted, Heizer breached that duty by failing to disclose any of the material facts concerning the transaction.

### 2. *The Pledge Transaction*

We turn now to the fifth, or pledge, transaction. Delaware law specifically provides that no shareholder approval is necessary to pledge a corporation's assets. Del. Code Ann., title 8, § 272. Therefore, under Rule 10b–5 disclosure to IDC's board of directors would be sufficient, unless Heizer controlled the board to such an extent that only the independent shareholders were able to safeguard the corporation's interests. *Bailey v. Meister Brau, Inc., supra*, 535 F.2d at 993. See also *Dasho v. Susquehanna Corp., supra*, 461 F.2d at 26.

Although the District Court made no findings to that effect, the record indicates that Heizer controlled three of the four members of IDC's board for purposes of the pledge transaction. Two directors were Heizer nominees. The third was Paul Roth, who had recently been hired as president of IDC by the Heizer directors, over the objection of the fourth director, Jordon Ross. Heizer's control over Roth is apparent from his trial testimony that, although he was unsure why Heizer wanted the pledge from a business standpoint,

"I was pretty much convinced that Heizer, you know, would insist on the pledging of the stock, and that I didn't have a hell of a lot of alternative short of resigning if it came to a matter of the pledge agreement." [Tr. 1326.]

It is clear that Roth was not alone in his perception of the situation: Edgar Heizer himself acknowledged that his company had

---

**11.** Letters from Kury to IDC's counsel indicate that Kury closely supervised the process of obtaining these waivers, at one point requiring IDC counsel to go back to some shareholders who had replied by telegram to obtain their written signature. [Pl. Ex. 26–28.]

assumed control of IDC when Jordon Ross (in his opinion irresponsibly) refused to hire Roth. [E. Heizer, Tr. 980.]

When an entire board of directors is controlled by a self-dealing director or shareholder the corporation can only be represented by the independent shareholders, to whom full disclosure must be made. See, e. g., *Dasho v. Susquehanna Corp., supra,* 461 F.2d at 26; *Schoenbaum v. Firstbrook, supra,* 405 F.2d at 219–220; *Pappas v. Moss,* 393 F.2d 865, 869 (3d Cir. 1968); *Ruckle v. Roto American Corp.,* 339 F.2d 24, 26, 29 (2d Cir. 1964). Conversely, where disinterested directors constitute a majority of the board of directors, disclosure to the board is sufficient. *Dasho v. Susquehanna Corp., supra,* 461 F.2d at 25. We are not aware of any prior case in which the court has confronted the issue of who represents the corporation in the middle situation presented here, where a majority, but not all, of the directors are controlled.

In the first *Dasho v. Susquehanna Corp.,* 380 F.2d 262, 270 (7th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 480, 19 L.Ed.2d 470 (1967), however, Judge Fairchild, concurring in the court's holding that the complaint stated a cause of action, observed that it would not be "sound to differentiate between situations where the directors were unanimous in their wrongdoing and those where less than all were involved." And in *Bailey v. Meister Brau, Inc., supra,* 535 F.2d at 993, the court, while dealing with a situation in which the board was completely controlled, stated the general principle of law as follows:

"Where the controlling stockholder causes the corporation to engage in a securities transaction in which the stockholder has a conflict of interest, it has the obligation to disclose to the other stockholders information in its possession which reflects on the fairness of the transaction."

Whether this rule, which is somewhat broader than the facts required, is to be automatically applied in all the cases it appears to describe, we need not decide. It should be applied here, where the lone minority director did not represent the interests of the second largest common shareholder and was completely excluded from the negotiation of the transaction. Under these circumstances, Heizer was obliged to disclose the material facts concerning the transaction to the independent shareholders prior to its consummation. This obligation was not fulfilled: the shareholders were first informed of the general terms of the pledge and the reasons therefor two months after the transaction. Thus, we hold that Rule 10b–5 was also violated by Heizer's failure to disclose material facts to the corporation in the fifth transaction.

E. *The Private Cause of Action: Reliance and Scienter*

In addition to proof of a technical violation of Rule 10b–5, a plaintiff in a private action based on the rule must also prove two elements traditionally associated with a common law action for fraud: he must show, first, that the defendant caused the alleged harm by inducing him to rely on material misstatements or misrepresentations and, second, that, in doing so, the defendant intended to deceive, manipulate or defraud. *Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

1. *Reliance*

In the ordinary 10b–5 case involving a failure to disclose, proof of materiality is sufficient to establish reliance. *Affiliated Ute Citizens v. United States,* 406 U.S. 128, 153, 92 S.Ct. 1456, 31 L.Ed.2d 741 (1972). In other words, courts will not attempt to determine whether the individual investor, once fully informed, would have refused to consummate the proposed transaction. Instead, reliance is presumed if the omitted information "would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Industries, Inc. v. Northway, Inc., supra,* 426 U.S. at 449, 96 S.Ct. at 2133.

In the transactions before us, in which the corporation itself is the "reasona-

ble investor," we have held that the minority shareholders represented the corporation for 10b–5 purposes. If these shareholders would have been powerless to prevent the proposed self-dealing by the controlling shareholder even if they had possessed knowledge of all the facts, the failure to disclose to them would presumably be immaterial and reliance could not be shown. See *Santa Fe Industries v. Green, supra,* 97 S.Ct. at 1301 n. 14. But that was not the case with either the fourth or fifth transactions in the case at bar.

■ In the fourth transaction, the shareholders had the power under state law to veto the transaction entirely. Thus, under the rationale of *Affiliated Ute Citizens,* proof of materiality is sufficient to establish reliance. *Cf. Mills v. Electric Auto-Lite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).[12] In the fifth transaction, the minority shareholders would have had the right to bring a derivative action in the state court on behalf of the corporation to enjoin any breach of Heizer's fiduciary duty to deal fairly with the corporation. In such an action, there would be a heavy burden upon the self-dealing fiduciary to demonstrate that the transaction was fair to the corporation. *Cf. Shlensky v. South Parkway Building Corp., supra,* 19 Ill.2d 268, 166 N.E.2d 793. Thus, again applying the principle underlying *Affiliated Ute Citizens,* in a 10b–5 action brought derivatively on behalf of the corporation by minority shareholders to whom the self-dealing controlling shareholder failed to make disclosure, if the controlling shareholder cannot demonstrate that the transaction is fair to the corporation, the requisite materiality is shown and reliance is to be presumed.[13] The minority shareholders are thus afforded the same right they would have had if full disclosure

had been made, *i. e.,* the right to obtain a judicial determination of the fairness of a transaction forced upon the corporation by a controlling shareholder with a conflict of interest. The existence of a causal link between Heizer's technical violation of Rule 10b–5 and the consummation of the pledge transaction depends, therefore, on the fairness of the transaction.

■ Heizer argues that the pledge should be sustained because it had no obligation to extend a loan to IDC and without the pledge it never would have loaned the funds necessary to continue the monitoring business. It is at least doubtful, however, that Heizer would have chosen to sacrifice the profit potential of that business, in which it had already invested $5.5 million, merely because it was denied a pledge which, by its own admission, was not necessary to secure repayment of its loans. [Tr. 933, 936–937.] But more importantly, Heizer forgets that, in view of its conflict of interest, once it chose to deal with IDC, it had an obligation under state law to structure the transaction in a manner consistent with its duty to "protect and preserve the corporation. . . . maintain[ing] a high standard of loyalty to [it]." *State ex rel. Farber v. Seiberling Rubber Co.,* 3 Storey 295, 53 Del. 295, 168 A.2d 310 (1961). In light of this obligation, its attempt to divorce its role as a creditor from its role as a fiduciary, in a transaction that required its consent in both capacities, cannot succeed. See *Todd v. Temple Hospital Association, Inc.,* 96 Cal.App. 42, 273 P. 595, 597 (1928). Allowing such a sleight of hand would render a fiduciary's duty of fair dealing meaningless whenever the corporation he served was in financial straits, because he could defend his conduct, as Edgar Heizer did on the witness stand in this case, by arguing

---

**12.** In *Mills,* the Court held that proof of unfairness is not required to show that plaintiffs relied on misrepresentations in proxy materials. In footnote 7 of its opinion, 396 U.S. at 385, 90 S.Ct. 616, the Court specifically reserved the question of what standard would be applied in cases where the majority had sufficient voting strength to carry the proposal but nevertheless sought proxies from the minority

through proxy statements containing material misstatements or omissions.

**13.** A fairness analysis has always been applied in 10b–5 derivative actions, see, *e. g., Schoenbaum v. Firstbrook, supra,* 405 F.2d at 219; *Bailey v. Meister Brau, Inc., supra,* 535 F.2d at 993, although without any articulation of the basis for doing so.

that in his role as a fiduciary he was powerless to resist the demands he himself had made in his role as a creditor.[14]

Given the obvious risks of unfairness created by Heizer Corporation's limited view of its fiduciary responsibility, the presumption of unfairness applied by the District Court was particularly appropriate. As the court noted, Heizer's explanations for the pledge did not overcome that presumption. Heizer sought to justify the pledge first as a device to discourage what it considered to be a nuisance suit, which, by calling into question Heizer's right to exercise its warrants to purchase common stock, prevented IDC from effecting the recapitalization it needed in order to attract outside financing. Assuming that IDC genuinely needed such protection, nevertheless Heizer's method of discouraging the suit was inconsistent with its duty to deal fairly with the minority. In threatening foreclosure on the pledge, Heizer was threatening to use a power acquired through its control of the corporation for the purpose of excluding the independent shareholders from further participation in IDC's business. Such a "freeze out" of the minority would appear to be a breach of fiduciary duty under Delaware law. See *Condec Corp. v. Lunkenheimer Co.*, 43 Del.Ch. 353, 230 A.2d 769, 775 (1967).

The second explanation Heizer advances for the pledge does not even purport to be connected with IDC's welfare. Plaintiffs' suit threatened the flexibility Heizer had gained through the first four transactions, to maintain its senior position or to convert its holdings into common stock: if plaintiffs were successful and Heizer was prohibited from exercising its warrants at what it considered to be a reasonable price, Heizer would be effectively locked into a senior position. Edgar Heizer testified that, under those circumstances, it would want to have the kind of security a conservative lender, such as a bank, would require to cushion its investment.

Under Delaware law, Heizer would have breached its fiduciary duty by using its power over the corporate machinery to effect a transaction intended solely to maintain or increase its control over the corporation. See, *e. g., Bennett v. Propp*, 41 Del.Ch. 14, 187 A.2d 405 (1962). In this case Heizer's conduct in using its control of IDC to protect itself in the event that it was found to have deceived the corporation was at least equally improper. Thus, we agree with the District Court's conclusion that the pledge was unfair and find the element of reliance to have been properly established in the fifth, as well as the fourth, transaction.

### 2. *Scienter*

The final element of a private cause of action under Rule 10b–5 is scienter, defined in *Ernst & Ernst v. Hochfelder, supra*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668, to exclude mere negligence. That case left open the question of whether recklessness is enough. In *Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033 (7th Cir. 1977), this court held that it is. See also *Sanders v. John Nuveen & Co.*, 554 F.2d 790 (7th Cir. 1977), (*Sanders II*). The District Court in the case at bar, while characterizing Heizer's conduct in the fourth and fifth transactions as "rapacious," made no other findings concerning defendant's mental state in failing to disclose. The record, however, indicates that defendant's omissions were at least reckless.

In *Sundstrand* and again in *Sanders II* this court quoted with approval the definition of recklessness in the context of an omission in *Franke v. Midwestern Oklahoma Development Authority*, 428 F.Supp. 719, 725 (W.D.Okl.1976):

"reckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure

**14.** Heizer stated: "Well, it's very hard, as you know, to separate your hats, but the way I had to look at it from Heizer Corporation's standpoint first, it was totally justified that we have security.

"Then, wearing my IDC hat as a director, I don't have very much choice. . . . I knew what Heizer Corporation would do if I didn't agree to give the security to Heizer Corp." [Tr. 933–934.]

from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it."

 Heizer's failure to disclose any of the terms of the fourth transaction was "highly unreasonable." Heizer knew that the proposed transaction was controversial: a Heizer vice-president testified that during negotiations "Joe Mitchell [president of plaintiff Beneficial] screamed adamantly that he didn't think [it] was a fair deal," [Tr. 1968] and threatened suit if the transaction was consummated. Yet Kury, Heizer's counsel who had been delegated to oversee the approval procedure, did not include any mention of the transaction in the written consents or an adequate description of it in the notice to shareholders who had not signed, never gave Jordon Ross any instructions on what he should tell the shareholders when he orally solicited their consents, and failed to ask Ross what he had said when he returned, approximately a day and a half later, with the signed consent forms. [Tr. 1144, 1147.] Instead, Kury and Heizer officers testified that they assumed the shareholders would know what was going on because they were Ross' friends and business associates [e.g., E. Heizer, Tr. 734–737] and because, in the past, those who spoke at the shareholders' meetings had always appeared well-informed. [E. Heizer, Tr. 748.]

At trial IDC's outside counsel testified that Jordon Ross had told him and Kury that, because the shareholders were his friends, he would be able to get their signatures in the short period of time available. [Tr. 1785.] On its face this statement implies that consents would be solicited on the basis of friendship rather than on the basis of properly disclosed facts. The shareholders' natural tendency to trust Ross' judgment would be further enhanced by the fact that Ross, who was the single largest shareholder, would seem to be the most vitally concerned with the corporation's welfare. Heizer officers had already decided that Ross was a gifted salesman, with an unfortunate tendency, however, to be unrealistic about IDC and its prospects for acquiring outside financing. [See, e.g., Pl. Ex. 66.] Thus, even if he did disclose some facts about the transaction, he could be expected to present them in the most attractive light possible. Under these circumstances, delegating Ross to solicit consents without any instructions whatsoever constituted "an extreme departure from the standards of ordinary care" that defendant should have observed in discharging its duty of insuring full and fair disclosure.

Heizer's conduct in the fifth transaction also bespeaks a reckless disregard of its duty to disclose. Heizer must have been aware that the pledge was for its own benefit and thus would arouse a great deal of opposition on the part of IDC's common shareholders. Yet it consciously decided, through Heizer counsel, not to take the proposal to the shareholders. The effect of this decision was to insure that at least plaintiff Beneficial, who no longer had a representative on IDC's board of directors, would not learn of a transaction admittedly designed, in part at least, to discourage its suit until after its consummation. We think this is a case for the application of the reasoning of the district court, adopted by this court in *Bailey v. Meister Brau, Inc.,* *supra,* 535 F.2d at 993:

> " '[B]linded by a conflict of interest, [defendant] wantonly ignore[d] evidence of the unfairness of [the] securities transaction to the corporation and therefore fail[ed] to disclose this evidence to those shareholders whose interests lie with the corporation.' "

### F. *Relief*

#### 1. *Unraveling Past Transactions*

 In granting relief in a case such as this, a court of equity should attempt to return the parties to the *status quo ante,* unraveling transactions effected through violations of Rule 10b–5 to the extent that it may do so fairly and without injuring the rights of innocent parties. See *Mills v. Electric Auto-Lite Co., supra,* 396 U.S. at 388, 90 S.Ct. 616. Heizer agrees that, if its

conduct in the fourth transaction violated Rule 10b–5, the District Court was correct in cancelling the conversion feature of, and any price adjustment effected through, that transaction. Another consequence of the fourth transaction that may also be easily unraveled is the IDC charter amendment permitting an increase in the number of authorized common shares.

■ With respect to the fifth transaction, Heizer again agrees that the pledge should be nullified if its conduct in obtaining it was wrongful. We, however, would hold the pledge void even if Heizer's conduct in the fifth transaction was not in itself actionable under Rule 10b–5. As we noted above, the pledge was designed to discourage the instant suit and to protect Heizer's position in the event it was found to have deceived the corporation. Thus, in a sense, the pledge was a consequence of the violation, and, like other, more direct consequences, should be dispelled insofar as possible. Voiding the pledge would injure no innocent party and would be consistent with a state law fiduciary analysis, see *supra*. Therefore, whether as an independent violation or a consequence of the violation in the fourth transaction, the pledge was properly nullified by the District Court.

Pursuant to the improperly disclosed fourth and fifth transactions, Heizer also extended approximately $3 million in short-term or demand loans to IDC. In his opinion, the district judge did not modify these obligations in any way, although he did enjoin Heizer from dealing unfairly with IDC in the future. After his opinion was filed, Heizer presented a recapitalization plan to IDC's common shareholders. In a proxy solicitation mailed to those shareholders, Heizer pointed out that "IDC does not have the financial resources necessary to repay all of the debts currently due and payable to Heizer," and threatened to put the company into bankruptcy if the plan was not approved.

On plaintiffs' motion, the district judge enjoined the consummation of this plan pending appeal, observing that the proposal itself appeared unfair. He also enjoined Heizer from collecting interest or principal on its loans to IDC.

Plaintiffs too complain of the District Court's disposition with respect to the demand loans. By way of a "Petition for Supplemental Relief," filed with the District Court on May 6, 1975, prior to the issuance of the court's opinion, but after the court had indicated to the parties what its decision would be, plaintiffs argued that these loans were in themselves an imposition on IDC's common shareholders and as such should be cancelled or reformed into common stock. In their petition plaintiffs also sought a permanent injunction to prevent Heizer from attempting to enforce any of the demand notes issued by IDC after November 19, 1971.

In May, 1975, the court stated that the petition would be taken under advisement. In its opinion issued on December 3, 1975, however, the court specifically denied one of plaintiffs' requests for relief, but failed even to mention the relief they had sought with respect to the demand loans. On January 6, 1976, plaintiffs attempted to reiterate their petition for supplemental relief by filing a motion to require defendant to answer. On May 28, 1976, after a remand from this court ordered for the purpose of enabling the District Court to rule on the petition and other still pending matters, that court finally denied plaintiffs' petition on the ground that it

"was mooted by or merged into the December 3 decree and the renewed petition was an untimely effort to modify the decree. Rule 59(e), Fed.R.Civ.P."

■ Heizer argues that the District Court's finding of untimeliness or merger was correct and that, inasmuch as plaintiffs failed to appeal from the December 3rd decree, we are without jurisdiction to consider the merits of plaintiffs' claim. In our opinion as originally issued we stated, without giving reasons, that we agreed with this position. On further consideration, however, we believe we were incorrect. Inasmuch as neither the opinion nor the decree of December 3, 1975 mentioned the petition for supplemental relief and concededly did

**254**

not dispose of the entire case (a finding under Rule 54(b), Fed.R.Civ.P. was included in the decree), and plaintiffs were not notified until May 28, 1976 of the District Court's view that it had ruled on the petition *sub silentio,* we think the decree should not be construed as having had that effect. It would be overly technical and unjust to hold that plaintiffs lost their right to appeal a ruling before they knew it had been made. Such a result is not required by anything in the Federal Rules of Civil Procedure and would be contrary to the admonition of Rule 1 that those rules "be construed to secure the just . . . determination of every action." We therefore consider the merits of the supplemental petition.

■■■ The loans themselves should not be subordinated unless it was unfair for Heizer to continue the monitoring business or to finance that business by extending loans rather than by contributing equity capital. On the first issue, in the absence of a finding by the District Court, we cannot say that Heizer's continuation of the monitoring business, which after all also involved risk to itself, was unfair to the corporation or the minority shareholders. And, insofar as the second issue is concerned, there is no requirement under state law that a fiduciary who agrees to provide financing must do so by means of an equity investment. Thus, the only inquiry that remains is whether the terms of the loans, apart from the convertibility feature and the security that have already been nullified, were fair to IDC and its common shareholders.

■■■ The combined effect of the short-term or demand maturity features of the loans made after the third transaction was to give Heizer the right to obtain a lion's share of the equity in IDC if the monitoring effort was successful and, if that effort was not successful, the power to recoup promptly its entire investment by calling the loans and putting IDC into bankruptcy. It is perhaps not inconceivable that fully informed minority shareholders would have jeopardized their indirect interest in the valuable T&R business for the prospect of a small interest in the increasingly dubious monitoring venture, and, to gain that end, would have placed themselves at the mercy of Heizer by entering into the fourth transaction and the ensuing loans. This possibility is not enough, however, to satisfy the burden of the self-dealing controlling shareholder to demonstrate the fairness of this heads-I-win-tails-you-lose series of transactions. The maturity features of the loans were hardly consistent with Heizer's duty to deal fairly with the corporation and its shareholders. See *Baron v. Allied Artists Pictures Corp.,* 337 A.2d 653, 658 (Del.Ch. 1975), *appeal dismissed,* 365 A.2d 136 (Del. 1976). Thus, in order to unravel in an equitable manner the transactions resulting from Heizer's wrongful conduct, the maturities of the loans should be adjusted to make them commensurate with IDC's ability to pay.[15] On remand, the District Court should make the necessary determinations and modify the terms of the loans accordingly.[16]

From this disposition, it follows that the District Court was correct in enjoining

---

**15.** This relief does not seem unduly harsh. The monitoring program has been dropped and T&R has always been a growing, profitable company; with T&R's earnings sheltered by IDC's loss carryovers, IDC should be able to pay back the loans eventually.

**16.** Ordering this relief is not inconsistent with the principle relied upon by Heizer in its petition for rehearing and declared in *Morley Construction Co. v. Maryland Casualty Co.,* 300 U.S. 185, 57 S.Ct. 325, 81 L.Ed. 593 (1937), that the rights of the appellee may not be enlarged in the absence of a cross-appeal. Statements made by the district judge at hearings on June 9 and June 18, 1975, and the relief granted by

him pending appeal, *viz.,* enjoining Heizer from collecting or threatening to collect its loans, indicate that he believed efforts by Heizer to enforce the present maturities were forbidden by paragraph 5 of the decree, which permanently enjoins Heizer "from entering directly or indirectly, into any transaction with IDC except upon such terms and conditions as shall be fair and equitable." He obviously viewed his prohibition, pending appeal, against enforcing the existing maturity provisions of the notes as not expanding that relief. In any event alteration of the maturities is within our power to order as a lesser included form of one kind of relief sought in the petition for supplemental relief, *viz.,* a complete prohibition against enforcement

Heizer from seeking to collect its loans or coercing agreement to its recapitalization plan by threatening collection pending appeal.[17]

### 2. Prospective Relief

Paragraph 5 of the decree permanently enjoins Heizer "from entering, directly or indirectly, into any transaction with IDC except upon such terms and conditions as shall be fair and equitable." Heizer argues that this provision is too vague to comply with the requirement of Rule 65(d), Fed.R. Civ.P., that "Every order granting an injunction . . . shall be specific in terms [and] shall describe in reasonable detail . . . the act or acts thought to be restrained," because it "cannot possibly know how to conform its conduct to Paragraph 5," which would require it "to try to predict whether its evaluation of its conduct will coincide with that [of] Judge Marshall—or whoever else might be called upon to judicially decide what is 'fair and equitable.'"

In determining the appropriate prospective relief, we must consider, on the one hand, the specificity requirement of Rule 65(d), on which Heizer relies, and, on the other, the difficulty of predicting the form of possible future undisclosed, unfair transactions which may result from Heizer's conflict of interest as the major creditor and controlling stockholder of IDC. There is a sufficient basis for the District Court's determination that some kind of restraint on future abuses is warranted, but Heizer must be specifically apprised of what is forbidden.

We must also consider whether an injunction requiring advance disclosure of any proposed transaction between IDC and Heizer would be sufficient, or whether the decree should address itself in any way to the substance of future transactions. Where the independent shareholders have the power under state law to approve or disapprove a transaction, fairness is, as we have said, irrelevant under Rule 10b–5. In that case, an injunction requiring full disclosure of all material facts concerning a self-dealing securities transaction would be sufficient. But where the self-dealing fiduciary controls the corporate voting machinery, the materiality of any future failure to disclose challenged under Rule 10b–5 will depend, as we have also seen, upon its fairness. If such a transaction were challenged in an independent federal action, a determination of unfairness, coupled with the breach of the 10b–5 duty to disclose, would lead the federal court to prohibit or set aside the transaction. As is apparent from our approval of the unraveling of the fourth and fifth transactions, we do not view *Green* as requiring the federal court merely to declare the breach of the duty to disclose and send the plaintiff to the state court to remedy the unfairness. The preventive prospective relief should not be narrower in scope than the relief that could be obtained in a new federal action to remedy the future wrong.

In light of the foregoing considerations, paragraph 5 of the decree should be deleted, and Heizer should be enjoined from failing to disclose to the common shareholders any material facts concerning future transactions it proposes to enter into, directly or indirectly, involving securities of, or held by, IDC. Specifically, Heizer should be required to disclose all facts bearing on the fairness of such a transaction, including its own valuation of the company and its fu-

of those notes. The denial of relief under that petition is the subject of the appeal in No. 76–1700.

**17.** Heizer's procedural attack on that injunction is without merit. In light of our modification of the demand loans, Heizer was not prejudiced by the denial of "the chance to present expert witnesses to explain how the recapitalization plan operated and how it was fair to all parties concerned." The only relevant evidence, Heizer's communication to the IDC shareholders, was before the District Court. Heizer also argues that plaintiffs should have been required to post bond. As plaintiffs point out, however, it was defendant who was acting under a permanent injunction and who nevertheless sought to change the status quo. Moreover, in view of our affirmance of the District Court's order, any error in not requiring a bond would have been harmless.

ture prospects. Furthermore, Heizer should be enjoined from entering into, directly or indirectly, any securities transaction with IDC unless that transaction has been approved by a majority of the shareholders other than Heizer or, failing such approval, has been found to be fair and equitable by the District Court or another court having jurisdiction to make such a finding. The foregoing relief makes more specific but does not expand the relief granted by the District Court: Heizer will thus be able to avoid the necessity of obtaining judicial approval for its self-dealing, but will not be foreclosed from using its voting power to approve a fair transaction which the common shareholders have capriciously rejected.

Heizer also argues that the District Court's decree enjoins the future operation of its antidilution or price-adjustment clause in the warrants obtained in the first three transactions and prohibits it from purchasing IDC stock, at any time in the future, for less than $3.60 per share. Plaintiffs read the District Court's order less broadly, arguing that it merely cancels the warrants in the fourth transaction and prohibits Heizer from using its price-adjustment provision unfairly in the future.

■ We think that the court's order is susceptible to the interpretation advanced by Heizer.[18] And we agree with Heizer that it would be inappropriate to limit the future warrant exercise price, in light of the District Court's determination, not challenged here, that the antidilution provisions in the first three sets of warrants were not improperly acquired. Moreover, as we have already held, federal law does not impose a limitation on the substantive terms of any future transaction which IDC's common shareholders are free to approve or disapprove.[19] On remand, the judgment will therefore be modified to so state.

## II.

### The Individual Claim

In No. 76–1701, plaintiff Beneficial appeals from the District Court's order of May 28, 1976 granting summary judgment to defendants on count III of the second amended complaint. In that count Beneficial alleged that in January 1969 it purchased a five-year, $435,000 debenture, convertible at its option to 21.25% of IDC's common stock. The agreement between Beneficial and IDC provided that

> ". . . it shall be mandatory upon BSC to convert the afore-mentioned debentures on or before the filing by IDC of the necessary documents and an 'S–1' statement with the Securities and Exchange Commission which sets forth that

---

**18.** Paragraph 2 of the decree, which plaintiffs quote in their brief, nullifies the future effect of warrants acquired through the fourth transaction and returns the parties to their positions prior to that transaction. Two subparagraphs, however, seem to go beyond a simple unraveling of the fourth transaction in permanently enjoining Heizer from

"(a) Exercising or attempting to exercise, directly or indirectly, any warrants to purchase shares of common stock of IDC, at an exercise price of less than $3.60 per share; and (b) Issuing or attempting to issue, directly or indirectly, any shares of common stock of IDC at a price of less than $3.60 per share upon the exercise of any warrants held by Heizer Corporation . . . to purchase shares of common stock of IDC."

Paragraph 3 also seems to refer to the antidilution clauses of the first three transactions: "In any transaction . . . between Heizer Corporation . . . and IDC, from and after the date hereof, no provision contained in any agreement heretofore entered into

which authorizes or permits an adjustment in the purchase price of any outstanding warrants to purchase IDC common stock, shall be of any force or effect. . . . Nothing herein contained shall prohibit Heizer Corporation from otherwise purchasing securities from or lending money to IDC under such terms and conditions as shall be fair and equitable."

The district judge's remarks at the June 18, 1976 hearing on plaintiffs' motion for an injunction pending appeal also indicated that he intended the decree to freeze the warrant exercise price at $3.60 per share.

**19.** The decree will not, of course, prevent a minority shareholder who contends that a proposed transaction is an unfair exercise of the self-dealing fiduciary's control from so asserting in a state court action, even though it has been approved by the other minority shareholders. The claims in this action being federal, the relief granted is designed only to vindicate federal rights.

IDC earnestly desires and seeks to make a public offering of its common stock in a minimum amount of Two Million Dollars."

A notice provision was included, requiring IDC to serve Beneficial with a copy of its registration statement and resolutions authorizing it ten days before filing. Plaintiff submitted exhibits and affidavits showing that there was a verbal understanding that, if the debenture was converted to facilitate a public offering and no such offering was made, it would be reconverted to a debenture.

On July 8, 1969, plaintiff was told by an attorney representing IDC that it was necessary for it to convert immediately in order for the public offering to progress. Plaintiff alleges that this representation was false[20] and was made

> ". . . in order to induce it to convert its debenture at its option, pursuant to the voluntary conversion provisions of said debenture agreement, and to make it unnecessary for IDC to invoke the mandatory conversion provision of said debenture agreement. The intent and purpose of IDC in so inducing BSC to voluntarily convert its debenture was to make such conversion irrevocable and to deprive BSC of its right to cancel and rescind such conversion in the event that the proposed public offering failed."

IDC filed a registration statement on July 23, 1969. The statement not having become effective by October 1st of that year, Beneficial demanded reconversion of its debenture. IDC assured it that the offering was proceeding and allegedly agreed to return the debenture if the offering did not go through. On November 1, 1970 Beneficial was informed that IDC's registration statement had been withdrawn. This action was filed on October 11, 1972.

In an unreported memorandum opinion the District Court granted IDC's motion for summary judgment on the grounds that, the fraud having been discovered on October 1, 1969, the action was barred by the three-year statute of limitations, Ill.Rev. Stat. ch. 121½, § 137.13(D), see *Parrent v. Midwest Rug Mills, Inc.*, 455 F.2d 123, 125 (7th Cir. 1972), and that, even if it were not barred, Beneficial had failed to establish a prima facie case that it had been injured by the alleged misrepresentations. We affirm this ruling.

Plaintiff argues that IDC should be estopped from claiming that the action was time-barred because plaintiff was induced to forego filing suit by IDC's representations that it would reissue the debenture if there was no public offering. Even assuming that the facts support plaintiff's claim of reasonable reliance on an offer of settlement, we think the district judge was correct in finding that plaintiff was not injured by the alleged misrepresentation.

Plaintiff's contention that the conversion was not required by the mandatory conversion provision of the agreement, and was therefore "voluntary" and induced by misrepresentation, is based on IDC's failure to give the notice called for in that provision. The conversion was not voluntary in the sense that Beneficial had decided to convert for its own reasons. IDC was clearly invoking the provision of the contract requiring conversion in the event of a public offering. A defect in the notice or demand given by IDC would not affect the duty to convert. The failure to observe the notice requirement, had it been raised at the time, could have been cured. Beneficial, however, waived the notice requirement by not insisting upon it at the time of the transaction

---

**20.** Plaintiff also alleges that there were false representations that a firm underwriting agreement existed, that the registration statement would become effective, and that the public offering would be consummated. There was a letter of intent from an underwriting firm, conditioning its support of the offering on the effectiveness of the registration statement and general market conditions. Any representations as to future events would have to be based on similar assumptions of favorable market conditions and favorable business operations for IDC. Plaintiff, however, does not allege that the public offering was a sham intended to induce it to convert its debenture, nor does not allege any cause for IDC's failure to make a public offering. Rather, it rests its claim on the distinction between a voluntary and a mandatory conversion, discussed below.

and proceeding without the required notice. The other conditions upon which a duty to convert would arise were satisfied within two weeks after the conversion took place.[21] Beneficial could not have been injured by being induced to do something which it would have been required to do two weeks later in any event. Any undertaking by IDC to allow reconversion might give rise to a claim under state law, but not under Rule 10b–5.

The District Court's decree of December 3, 1975 is in part affirmed and in part vacated with directions to modify. The order of May 28, 1976 is affirmed insofar as it entered summary judgment in favor of IDC on Count III of the complaint and modified insofar as it dismissed the petition for supplemental relief. The case is remanded to the District Court for further proceedings consistent with this opinion. In Nos. 1140, 1700, and 1702, which were briefed together, plaintiffs shall recover costs against Heizer. In No. 1701, IDC shall recover costs against Beneficial.

---

21. A registration statement as described in the agreement was prepared (and a draft was forwarded to Beneficial before filing) and filed with the SEC together with other necessary documents.